IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## STATE OF TENNESSEE v. JEFFREY ALLEN JUDKINS

**Appeal from the Circuit Court for Lawrence County**
**No. 34363      Robert L. Jones, Judge**

_____

### No. M2018-00704-CCA-R3-CD

_____

The Defendant, Jeffrey Allen Judkins, appeals his jury conviction for aggravated robbery, for which he received a sentence of twenty-two years' incarceration. In this direct appeal, the Defendant alleges that the evidence was insufficient to establish his participation in the robbery. Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellant, Jeffrey Allen Judkins.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Gary M. Howell and Christi L. Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

On March 23, 2017, the Lawrence County Grand Jury indicted the Defendant for aggravated robbery, a Class B felony. See Tenn. Code Ann. § 39-13-402. He proceeded to a jury trial.

At trial, Melody Denton testified that, on the evening of October 18, 2017, she was working alone at the Fall River Market in Lawrenceburg, Tennessee. It was already dark outside when a man wearing a ski-mask entered the store with a "sawed-off" shotgun, pointed it at her, and demanded that she give him the "big bag" of money kept behind the

store counter. Ms. Denton believed that she was being pranked until she asked the man, "Are you messing with me?" and he replied by "jabbing" the shotgun at her and demanding, "[N]o, I've got [the gun] cocked, give me the f--king bag." Ms. Denton complied and gave the man the bag with several checks and approximately $300 cash inside. After the man grabbed the bag and ran out of the store, Ms. Denton hit the "panic button" to alert the authorities, who received the call at 7:46 p.m. Ms. Denton saw a white Nissan Frontier exiting the parking lot and the man chasing after it. She locked the front door so that the man could not re-enter. Ms. Denton relayed that the incident was very quick, lasting "less than a minute," and that she felt "[n]ervous" and "[s]cared" while it occurred.

Ms. Denton indicated that the man was wearing gloves and a dark-colored "hoodie." Although the hoodie had a picture and writing on it, Ms. Denton could not recall the details. Ms. Denton did not recognize the man, and the ski-mask covered his face except for his eyes. Ms. Denton described the man as "scrawny" and stated that he was taller than she, relaying that she was five feet, four inches tall. She was confident that it was a man and not a woman.

Ms. Denton unlocked the door when a store neighbor, Jeffrey Smith, arrived. Mr. Smith lived on Marable Road directly behind the Fall River Market, and Mr. Smith knew Ms. Denton because he frequently shopped at the store. When Mr. Smith asked Ms. Denton if she was alright, she informed him that the store had just been robbed.

Mr. Smith explained that he and his family had just arrived home around 8:00 p.m. on the evening of October 18 when a small white truck with "a camper shell" covering the bed seemed like it was going to pull into his driveway behind him. However, the truck eventually parked behind Fall River Market and turned off its headlights with the parking lights still illuminated. According to Mr. Smith, the front passenger's side parking light on the truck was not working. Mr. Smith found the situation odd, so he remained outside to observe. Mr. Smith saw an individual exit from the passenger's side and slam the door before heading towards the front of the store. Mr. Smith first thought maybe it was a couple having an argument because the person who exited the truck was similar in stature to Mr. Smith's wife. Mr. Smith described the person who exited the truck as a smaller individual, estimating that the individual was about five-feet-eight or -nine inches tall and weighed around 140 pounds.

Mr. Smith saw the truck leave its location from behind the store and back out on to Fall River Road. When the person emerged from inside the store, Mr. Smith shined his flashlight and yelled at the individual, asking "what the F he was doing over there." Mr. Smith observed the individual, who was carrying something in his hands, take off running after the truck. Mr. Smith stated that it was dark outside and that the person was wearing a dark-colored hoodie and the person's face was covered by a mask or toboggan,

so he was unable to get a good view of any facial features. Mr. Smith told his children to lock the door and stay inside while he walked to the store to see if help was needed. According to Mr. Smith, Ms. Denton appeared "fairly upset and rattled." Mr. Smith estimated that about a minute-and-a-half to two minutes had elapsed "[f]rom the time that [he] first noticed the truck pull up and shine its lights on [his] house, [until] the time it took off Fall River Road towards Lawrenceburg[.]"

The day after the robbery, Vergie Nix found the store's bank bag on the side of Crowder Road. The bag was identifiable because "Fall River Market" was printed on it. Ms. Nix, having heard about the robbery, returned the bag to the store.

Ricky Alexander, the co-defendant in this case, relayed that he knew the Defendant because they grew up together. The co-defendant confirmed that, in October 2016, he lived in an apartment on Manor Drive in Lawrenceburg and drove a white Nissan Frontier truck with a camper shell on it. During this time frame, he ran into the Defendant, who needed work to make some money. The co-defendant had worked for a man named Buckshot Brannon for many years, so he helped the Defendant get a job with Mr. Brannon. The co-defendant also agreed to let the Defendant stay with him in his apartment because he had no place to live.

According to the co-defendant, on October 18, 2017, nearly a week after the Defendant had been staying with the co-defendant, the Defendant said that he wanted to go rob Fall River Market because he had seen a large bag of money behind the counter a few days prior. According to the co-defendant, the Defendant had been talking about robbing other places "off and on" for a few days because "he was wanting some money real bad." The co-defendant testified that the Defendant had brought a sawed-off shotgun into the apartment early that same evening. The co-defendant maintained that, although he was trying to dissuade the Defendant from robbing Fall River Market, he agreed to drive the Defendant there to look at the store. Upon arriving, the co-defendant pulled his truck behind the store and turned off its headlights. The Defendant then quickly exited the truck and went inside the store. Because the co-defendant was not prepared for the Defendant to actually go inside the store, the co-defendant backed out from where he was parked, pulled into the parking lot, and started to drive towards town.

However, the co-defendant saw the Defendant come out of the store and start running after him. The co-defendant testified that he also saw a man standing in front of the house behind the store and that the man was yelling "what are y'all doing." The co-defendant turned his vehicle around and picked up the Defendant at "a mechanic place where they worked on big trucks and stuff." As they traveled back past Fall River Market, the co-defendant saw the woman who worked at the store and the man from the house behind the store engaged in a conversation.

-3-

The co-defendant claimed that he and the Defendant "almost c[a]me to blows" as they drove away from the store because of what the Defendant had done. The co-defendant testified that the Defendant began throwing items out of the vehicle, specifically, the money bag, the ski-mask or toboggan the Defendant was wearing, and the shotgun. The co-defendant affirmed that none of the items belonged to him, although he acknowledged that he wore a hat, gloves, and a sweatshirt for work that he often left in his truck. The co-defendant acknowledged that he received $100 in cash from the Defendant. Moreover, the co-defendant admitted that he and the Defendant, knowing the police would try to find them and the truck, removed the camper shell from the truck bed and placed it in the pasture on Mr. Brannon's property, unbeknownst to Mr. Brannon. The co-defendant asserted that the Defendant left the day after the robbery and that he was thereafter unable to contact the Defendant by phone.

Detective Zach Ferguson with the Lawrence County Sheriff's Office investigated the robbery. He arrived on the scene at 8:08 p.m. and spoke with the witnesses present. Detective Ferguson later learned that HLH Express, a trucking company on Crowder Road, might have relevant video footage. When Detective Ferguson visited the owner of the trucking company, David Goolsby, they reviewed video footage showing a white Nissan Frontier with a camper shell stop in front of the shop around 7:45 p.m. Mr. Goolsby described that, in the video, the truck pulled towards some pine trees, that someone came "from the left" and got into the truck, and that the truck then made "an abrupt U-turn and sp[u]n out." From this footage, Detective Ferguson was ultimately able to identify the co-defendant's truck. However, the individuals were not identifiable in the video.

On October 28, 2016, the police spoke with the co-defendant and, with his consent, searched the white pickup truck. Detective Ferguson stated that the parking light on the truck did not work and that the truck appeared to have had a camper shell on the truck bed that had been removed.

The co-defendant initially lied and told the police that he had no knowledge of the robbery of Fall River Market and informed them that his daughter had recently borrowed the truck. He further told them that she had gotten into an accident and left the scene. However, after the police began questioning his daughter, who was incarcerated, the co-defendant decided to admit to his role. The co-defendant gave a written statement on November 2, 2016.

The co-defendant informed Detective Ferguson that he and the Defendant had hidden the camper shell on Mr. Brannon's property. Detective Ferguson visited the property and found the camper shell. According to Detective Ferguson, the camper shell had not been out there long because the grass underneath it was relatively undisturbed.

The co-defendant also told Detective Ferguson where the Defendant had discarded the items along the roadside as they drove away from Fall River Market. On November 2, 2016, Detective Ferguson was able to locate a black ski-mask, a black glove, and a dark-colored hoodie with white writing on it in a ditch off Skyline Drive. However, the shotgun was never located. Later analysis on the clothing items revealed that the Defendant was the primary contributor of DNA found on the ski-mask and glove. Although the DNA of a "minor contributor" was also found on those clothing items, there was insufficient DNA to identify this second person.

At trial, the co-defendant denied that his daughter was with him that night or involved in the robbery. The co-defendant maintained that he decided to tell truth because he and the Defendant were "guilty as sin." Moreover, the co-defendant confirmed that he had an extensive criminal record beginning when he was a juvenile, including being convicted of armed robbery in 1978. He had also been incarcerated on three separate occasions from the 1970s to the 1990s. The co-defendant indicated that he had since made steps to better himself, such as drug rehabilitation. However, he acknowledged that he had pled guilty to vehicle theft around 2010.

The co-defendant admitted that he received disability income from the government despite his employment with Mr. Brannon. He had required "back surgery from deteriorating discs." The co-defendant explained that he did not work full-time for Mr. Brannon and only did "small jobs."

The co-defendant maintained that he was approximately five feet, ten inches tall. When questioned further about his height, the co-defendant explained, "I know when I had my back surgery, it seemed like I drawed [sic] up and I shriveled up to almost nothing. I don't even know if I'm 5'10 anymore. I may not even be 5'9. I'm not really sure." The co-defendant indicated that he weighed 146 pounds at a recent doctor's visit. The co-defendant said he likely "changed [his] appearance" after the incident, for example, by trimming his beard.

In addition, the co-defendant acknowledged that he was later indicted for the robbery of Fall River Market along with the Defendant. The co-defendant was not arrested until after he was indicted in March 2017, approximately five months following the robbery. He maintained that he was not being promised anything in exchange for his testimony against the Defendant.

At the conclusion of proof, the jury found the Defendant guilty as charged. The parties reached a sentencing agreement, and on December 14, 2017, the trial court sentenced the Defendant to twenty-two years at eighty-five percent. This appeal followed.

ANALYSIS

The Defendant's sole issue on appeal is whether the evidence was sufficient to support his aggravated robbery conviction. Specifically, the Defendant contends that "[his] involvement" was not established beyond a reasonable doubt. According to the Defendant, "[t]he most compelling and direct evidence against [him] was presented by co-defendant Ricky Alexander." The Defendant submits that his co-defendant's testimony "should be considered unreliable and disregarded" because (1) the co-defendant only made the decision to tell the truth when his daughter became the target of the police investigation, (2) the co-defendant could have planted the Defendant's mask and glove, and (3) the co-defendant received favorable treatment from the prosecution given that he was not charged for five months after the robbery and he was "allowed to remain free in the community without having to make any bond." The State counters that the evidence was sufficient, noting that the jury, as was their prerogative, accredited the testimony of the co-defendant and that the co-defendant's testimony was corroborated by the evidence at trial.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>see</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." <u>Id.</u> (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably

believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A "taking" or theft of property occurs if, with intent to deprive the owner of property, a person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a).

Although not specifically referenced, the Defendant's sufficiency argument involves two different legal principles—that his identity as a perpetrator must be established beyond a reasonable doubt and that the testimony of an accomplice must be sufficiently corroborated. "The identity of the perpetrator is an essential element of any crime." State v Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

In addition to being the primary perpetrator of the crime, the jury was instructed in this case that the Defendant's guilt could be predicated upon a theory of criminal responsibility for the conduct of another. The State was not required to elect between prosecution as a principal or under a theory of criminal responsibility. State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998); see also State v. Kenon Pack and Jennifer Banks, No. W2014-00518-CCA-R3-CD, 2015 WL 3381223, at *7-8 (Tenn. Crim. App. May 26, 2015).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which

-7-

participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); see State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Moreover, the trial court appropriately charged that Ricky Alexander was an accomplice to the crime. It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34,43 (Tenn. 1964)). Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

First, we note that the Defendant goes through great pains to discredit his co-defendant. However, the jury chose to accredit the co-defendant's testimony despite knowing that he had originally lied to the police about his involvement, that he had access to the Defendant's clothing, that he received potential benefits for his testimony against the Defendant, and that he had an extensive criminal record. As we have stated time and time again, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. Bland, 958 S.W.2d at 659. Moreover, the jury was free to reject some portions of the co-defendant's testimony while accepting others. State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996) (holding that juries are "free to believe only part of a witness' testimony").

In addition, the evidence at trial established that, on the evening of October 18, 2017, the Defendant entered Fall River Market brandishing a sawed-off shotgun and wearing a ski-mask and gloves. The Defendant pointed his weapon at Ms. Denton and demanded that she give him the money bag kept behind the store counter. Ms. Denton complied and gave the Defendant the store's money bag that contained the store's checks and about $300 cash. The Defendant fled on foot and had to chase down his co-defendant who was driving away. Mr. Smith yelled at the Defendant as he ran from the store. Ultimately, the Defendant was picked up by his co-defendant at the HLH Express trucking company, which was captured on video. Mr. Smith went to check on Ms. Denton, who informed him that she had just been robbed.

The co-defendant ultimately admitted to his involvement as the driver in the robbery of Fall River Market and confirmed that he received $100 cash from the proceeds of the robbery. According to the co-defendant, the Defendant discarded items along the roadway as they drove away from the store. The co-defendant was able to provide the police with the location where a black ski-mask, a black glove, and a dark-colored hoodie were found on November 2, 2016, over two weeks after the robbery. Those items were tested, and the Defendant was determined to be the primary contributor of DNA obtained from the mask and glove, although there was DNA of a second individual present. Ms. Nix discovered the money bag on Crowder Road. Moreover, the co-defendant indicated that he and the Defendant removed the camper shell from the truck bed and hid it on Mr. Brannon's property in an effort to avoid detection. Detective Ferguson located the camper shell, which Detective Ferguson believed had only recently been discarded based on the appearance of the grass underneath it.

The co-defendant testified that, as he and the Defendant traveled back past Fall River Market, he saw the woman who worked at the store and the man from the house behind the store engaged in a conversation. The co-defendant also said that he heard that same man yelling at the Defendant. Both Mr. Smith and Ms. Denton provided similar details at trial. We conclude that this evidence, when viewed in a light most favorable to the State, was sufficient to establish the Defendant's identity as a perpetrator of the robbery of Fall River Market and provided sufficient corroboration of the co-defendant's testimony.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-9-